AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Middle District of Florida

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| LUIS RUBEN MARTINEZ CALDERON | ) |
| AISHA NICOLLE SANCHEZ | ) Case No. |
| EVELYN CALDERON | ) 6:25-mj- 1117 |
| QUAMAIN ALIQUE BARBER | ) |
| BERNARDO ANTONIO BREA | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___01-15-25 through 02-05-25___ in the county of ___Orange___ in the ___Middle___ District of ___Florida___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846. and 21 U.S.C § 841 | Conspiracy to distribute and possess with intent to distribute a mixture or substance containing a detectable amount of cocaine |

This criminal complaint is based on these facts:

See Affadavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

SA John Fetscher, FBI
*Printed name and title*

Sworn to before me over the telephone or other reliable electronic means and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date: ___2/5/25 3:54pm___

_____
*Judge's signature*

City and state: ___Orlando___

HON. LESLIE HOFFMAN PRICE
*Printed name and title*

UNITED STATES DISTRICT COURT
MIDDLE DISTRCT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.

LUIS RUBEN MARTINEZ CALDERON
AISHA NICOLLE SANCHEZ
EVELYN CALDERON
QUAMAIN ALIQUE BARBER
BERNARDO ANTONIO BREA

Case No. 6:25-mj- 1117

## AFFIDAVIT IN SUPPORT OF COMPLAINT
## AND ARREST WARRANT

I, John Fetscher, being duly sworn, state the following:

### Agent Background

1.      I am a Special Agent ("SA") with the Federal Bureau of Investigation

("FBI") and have been since January 2020.  I am an investigative or law enforcement

officer of the United States within the meaning of 18 U.S.C. § 2510(7) and am

empowered by law to conduct investigations of, and to make arrests for, offenses

enumerated in 18 U.S.C. § 2516. I am currently assigned to a squad that investigates

criminal enterprises and violent gangs out of the Tampa Field Office, Orlando

Resident Agency, and I have been assigned to this position since 2020. Prior to being

an FBI SA, I was a police officer in South Carolina and Pennsylvania for

approximately nine years. I was also a member of the Montgomery County

Pennsylvania Drug Task Force where I received training in drug identification and investigation, highway interdiction, surveillance operations, and police intelligence.

2.      I am familiar with, and have participated in, all normal methods of investigation into drug trafficking, including, but not limited to, visual and electronic surveillance, the questioning of witnesses, and the use of search and arrest warrants, informants, and pen register and trap and trace devices. I have participated in investigations into illegal drug trafficking, including Organized Crime Drug Enforcement Task Force ("OCDETF") drug conspiracy and distribution investigations. I previously participated in federal and state wiretap investigations that targeted organizations trafficking methamphetamine, heroin, cocaine, and prescription pills. In those investigations, my duties have ranged from case agent to conducting surveillance. I have also monitored telephone activity in wire rooms and have coordinated surveillance teams.

3.      I have specialized training in narcotics identification, street-level drug trafficking, surveillance, organized crime, and drug abatement techniques. During the course of my law enforcement career, I have arrested individuals for various drug violations and have spoken with drug dealers, violent street gang members, and informants concerning the methods and practices of weapons trafficking, drug trafficking and various violent crimes. I have participated in investigations resulting in the arrests of individuals who have smuggled, received, and distributed controlled substances, and the arrests of individuals who have laundered proceeds derived from those illegal activities. These investigations have also resulted in seizures of illegal

2

drugs and proceeds from the distribution of those illegal drugs. I have also conducted

investigations concerning violent incident crimes such as bank robberies, Hobbs Act

robberies and carjackings. I have participated in the debriefings of many of those

individuals arrested who later cooperated with the government. I have directed

confidential informants and cooperating witnesses to successfully infiltrate narcotics

enterprises for intelligence gathering, participated in consensual recordings, and

monitored purchases of controlled substances. I have also executed search warrants

for evidence related to the investigations listed above.

    4.    Through my employment as an SA, I have gained knowledge in the use

of various investigative techniques, including the use of wire and electronic

interceptions and other types of electronic surveillance, physical surveillance,

undercover investigators, confidential informants, cooperating witnesses, controlled

purchases of illegal drugs, consensually monitored recordings, investigative

interviews, trash searches, mail covers, administrative subpoenas, and search and

arrest warrants.  I have experience installing and monitoring tracking devices on

vehicles. I have installed and monitored tracking devices on vehicles in other

narcotics investigations as well as homicide investigations during the course of my

employment with the FBI.

    5.    The facts contained in this affidavit are based on my own personal

knowledge, government records, and/or information relayed to me by other federal,

state, and local law enforcement personnel.

6.      I believe that the information and facts set forth in this affidavit establish probable cause to support the issuance of a complaint charging the defendants for their participation in the

7.      I am knowledgeable about state and federal drug laws. I have participated in a number of drug trafficking, money laundering, and organized crime investigations. Furthermore, I have received instruction on being able to identify and investigate DTOs, execute arrest warrants on members of those organizations, seize and process evidence, and ultimately prosecute members of the DTO. As a Special Agent, I have worked on multiple investigations targeting drug traffickers as well as money launderers. Based on my training and experience, I am familiar with the manner and means in which narcotics traffickers and organized crime groups conduct their business, including methods of importing and distributing narcotics, money laundering, the use of residential telephones, business telephones, cellular telephones, and other communication devices to facilitate their illegal acts.

8.      I have conducted investigations concerning the identification of co-conspirators through the use of telephone records, financial records, and other pertinent documents. I have also conducted surveillance in connection with numerous narcotics investigations, through which I have learned valuable information regarding the techniques used by DTOs to distribute drugs in both domestic and international markets. As a result of my training and experience, I am familiar with the way in which DTOs illegally traffic, transport, and distribute drugs, and launder the proceeds derived from their drug distribution activity.

4

9.     Based on my training and experience, I can attest that individuals
involved in the illicit possession, distribution, manufacture, transportation, and
trafficking of controlled substances, as well as the laundering of drug proceeds, often
use telephones to discuss and facilitate their illegal activities. In order to conceal their
identities and avoid detection from law enforcement, narcotics traffickers often enlist
the aid of friends, relatives, and acquaintances to distribute or store controlled
substances or launder drug proceeds. Narcotics traffickers often use the names of
these individuals or fictitious names to subscribe to telephone services, purchase
property, and rent or register vehicles.  Based on my training and experience, I know
that drug trafficking at the retail level is largely a cash business.  I know that drug
traffickers often generate large amounts of unexplained wealth, and through financial
transactions, attempt to conceal, disguise or legitimize unlawful proceeds through
domestic and international banks and their attendant services, securities brokers,
professionals, such as attorneys and accountants, casinos, real estate, shell
corporations and business fronts, and otherwise legitimate businesses which generate
large quantities of currency.  In addition, drug traffickers often use drug proceeds to
purchase additional narcotics to perpetuate and promote the ongoing conspiracy.  I
know that drug traffickers often use cellular telephones to communicate with co-
conspirators in furtherance of their money laundering activities.

10.     Through my employment as a law enforcement officer, I have gained
knowledge in the use of various investigative techniques, including the use of wire
and electronic interceptions and other types of electronic surveillance, physical

5

surveillance, undercover investigators, confidential informants, cooperating witnesses, controlled purchases of illegal drugs, consensually-monitored recordings, investigative interviews, trash searches, mail covers, financial investigations, administrative subpoenas, and search and arrest warrants.

## Purpose of Affidavit

11.    The information set forth herein is based on the following: (a) my own personal observations; (b) information that I received from other law enforcement officers involved in this investigation, including by reviewing official reports prepared by other law enforcement officers; (c) interviews of witnesses and the review of reports summarizing the interviews of witnesses; and (d) information provided to me by law enforcement officials who met with and interviewed said witnesses.

12.    Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint, I have not set forth each and every fact that I learned as a result of this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause that a violation of federal law has been committed. Unless otherwise noted, all statements of other persons described in this affidavit are set forth in substance and in part, rather than verbatim.

13.    As set forth below, there is probable cause to believe that on or before January 15, 2025 occurring through the date of this affidavit, in the Middle District of Florida, LUIS RUBEN MARTINEZ CALDERON, AISHA NICOLLE SANCHEZ, EVELYN CALDERON, QUAMAIN ALIQUE BARBER, and

6

BERNARDO ANTONIO BREA did knowingly conspire to distribute and possess
with intent to distribute a controlled substance, *i.e.*, a mixture or substance
containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 846 and
841(a)(1)(B).

## Probable Cause

### *January 15, 2025 Undercover Purchase of Cocaine from BARBER*

14.     On January 15, 2025 at approximately 1300 hours, QUAMAIN
ALIQUE BARBER, using phone number (689)-259-0356, arranged to sell two
ounces of cocaine for $875.00 per ounce to an individual who was actually an
undercover law enforcement officer, UC-1.  BARBER planned to meet UC-1 during
his lunch break on Thursday, January 16, 2025.

15.     On January 16, 2025, at approximately 12:55 p.m., agents conducting
physical surveillance of BARBER's workplace observed a tall black male enter the
front passenger door of a red, four door Mercedes-Benz. Agents were able to
positively identify the mentioned black male as BARBER.



16.     On January 16, 2025, at approximately 12:56 p.m., agents observed the
driver of the red Mercedes-Benz arrive at the predetermined location for the

7

controlled narcotics purchase with UC-1. At approximately 12:57 p.m., the driver of the red Mercedes-Benz parked in a parking stall next to the driver side of the undercover vehicle and UC-1 observed BARBER exit the front passenger side of the red Mercedes-Benz. UC-1 observed BARBER walking towards the undercover vehicle and entering the front passenger side of the undercover vehicle. While inside the undercover vehicle, UC-1 greeted BARBER. BARBER provided UC-1 with a sample by providing a small plastic baggie containing two small powdery rocks:





17.    BARBER told UC-1 he was able to get and sell cocaine anytime during the day. UC-1 gave BARBER $1,750.00 in exchange of the mentioned clear plastic

8

zip lock bag containing the suspected cocaine. UC-1 asked BARBER if he can get "blues," which is a common street slang referring to oxycodone M30 prescription pills or fentanyl pills pressed to resemble such pharmaceutical narcotics. BARBER said he can get and sell 25 "blues" for $125. UC-1 asked BARBER if he could get the fake, fentanyl pressed "blues." BARBER said he can get them, and they will be cheaper than the real ones. UC-1 asked BARBER if he can give him a cheaper price for the cocaine, if he buys four and a half ounces of cocaine at once. BARBER told UC-1 he would sell the cocaine for $825 per ounce if UC-1 orders that quantity. BARBER provided UC-1 with his phone number (xxx) xxx-0356 for future drug orders. BARBER exited the undercover vehicle and re-entered the red Mercedes-Benz.

18.     After the transaction, agents followed BARBER in the red Mercedes-Benz as the vehicle traveled from the deal location to an apartment complex in Kissimmee, Florida (Apartment Complex 1). At approximately 1:11 p.m., BARBER exited the red Mercedez-Benz and went to the second level of a building in Apartment Complex 1, in the vicinity of the residence of LUIS RUBEN MARTINEZ CALDERON. At approximately 1:17 p.m., BARBER walked down the stairs and into red Mercedes-Benz and subsequently drove away from the area.

19.     The drugs distributed by BARBER to UC-1 were field tested and indicated presumptive positive for cocaine.  The small clear plastic baggie, containing the two small powdery rocks weighed a total of approximately 1.0 grams

9

(including packaging). The second plastic baggie, containing the powder, weighed approximately 60.4 grams (including packaging).

### *January 21, 2025 Coordination of Cocaine Distribution*

20.    On January 17, 2025, the Honorable Carlos E. Mendoza, District Judge in the Middle District of Florida signed an order authorizing the interception of wire communications to and from CALDERON's cellular device with corresponding dialing digits (xxx) xxx-7199.

21.    On January 21, 2025, at approximately 3:44 p.m. CALDERON, using the phone number ending x7199, placed an outgoing call to a phone number known by agents to be used by CALDERON's mother EVELYN CALDERON (E. CALDERON). During this phone call, CALDERON asked E. CALDERON to bring him "two."

22.    On January 21, 2025, at approximately 4:08 p.m. CALDERON received an incoming call from E. CALDERON.  The following is a summary of this intercepted call and not a verbatim translation:

> E. CALDERON:    asks if he needs the "two" today.
> CALDERON:       affirms.
> E. CALDERON:    says she'll go over after she cooks.

23.    Based on my training, experience, and knowledge of the case, I believe that when E. CALDERON asked about the "two" she was referring in the same code as her son to the same quantity of narcotics he previously requested.

10

24.     On January 21, 2025, at approximately 5:16 p.m. CALDERON placed

an outgoing call to E. CALDERON. The following is a summary of this intercepted

call and not a verbatim translation:

| | |
|---|---|
| CALDERON: | asks if E. CALDERON is on her way. |
| E. CALDERON: | says she is not. |
| CALDERON: | asks E. CALDERON to bring the entire suitcase. |
| E. CALDERON: | says she told CALDERON she had to cook first. |
| CALDERON: | says he needs "it" today because he is almost out. |
| E. CALDERON: | acknowledges and says she'll finish cooking. |
| CALDERON: | tells E. CALDERON to bring the entire suitcase so she does not have to go in and out. |

25.     Based on my training, experience, and knowledge of the case, I believe

that the "entire suitcase" referred to a quantity of drugs that E. CALDERON was

storing for CALDERON inside her residence.

26.     On January 21, 2025 at approximately 5:39 p.m. CALDERON

received an incoming call from a phone number used by an individual later

confirmed by surveillance to be BARBER. The following is a summary of this

intercepted call and not a verbatim translation:

| | |
|---|---|
| BARBER: | tells CALDERON that he needs an "eighth". |
| CALDERON: | says he only has a "zip" left and is waiting for his mother to bring the shit over. |
| BARBER: | says he will come over for a "zip" for sure and will wait for CALDERON to get the rest of the "brick." |
| CALDERON: | says he's just waiting for his mom go over because he told her about 3 hours ago. Then tells BARBER to come over for the "zip." |
| BARBER: | tells CALDERON he's leaving work and heading over now. |

27.     Based on my training, experience, and knowledge of the case, I believe

that "eighth" refers to an amount of narcotics, a "zip" refers to an ounce of narcotics,

11

and a "brick" refers to a kilogram of narcotics. I know that cocaine in particular is commonly stored, transported, and smuggled in compressed rectangular powder "bricks."

28.    On January 21, 2025, at approximately 5:50 p.m. CALDERON placed an outgoing call to E. CALDERON. The following is a summary of this intercepted call and not a verbatim translation:

| | |
|---|---|
| CALDERON: | asks E. CALDERON if she is still at home. |
| E. CALDERON: | says she is |
| CALDERON: | tells E. CALDERON that AISHA will go pick "it" up because E. CALDERON is taking too long. |
| E. CALDERON: | acknowledges. |

29.    Based on my training, experience, and knowledge of the case, I believe that "AISHA" refers to CALDERON's girlfriend AISHA NICOLLE SANCHEZ (SANCHEZ), who resides with CALDERON in their apartment in Apartment Complex 1 and that CALDERON needed the narcotics sooner than E. CALDERON could provide it, so he was sending SANCHEZ to obtain it.

30.    On January 21, 2025, at approximately 6:16 p.m. CALDERON received an incoming call from a number known to be used SANCHEZ. The following is a summary of this intercepted call and not a verbatim translation:

| | |
|---|---|
| SANCHEZ: | says she is almost there and asks if his mom can leave it outside so she can just pick "it" up and go. |
| CALDERON: | asks if she is already there. |
| SANCHEZ: | says she is down the road. She asks if he "has people waiting on him" and he says no. |
| CALDERON: | tells SANCHEZ he will call his mom. |

31.     On January 21, 2025, at approximately 6:42 p.m. CALDERON placed an outgoing call to SANCHEZ.  During this phone call, SANCHEZ indicated that she was there and wanted to hurry up and that she was waiting and his mom was not coming out.

32.     On January 21, 2025, at approximately 7:02 p.m. SANCHEZ was observed returning to their apartment in Apartment Complex 1 in CALDERON's white Alfa Romeo. SANCHEZ was observed walking towards the apartment carrying a suitcase. She was observed carrying the suitcase up the stairs to apartment and entered the apartment in Apartment Complex 1 with the suitcase and shut the door:



33.     Based on my training, experience, and knowledge of the case, I believe that SANCHEZ was retrieving a suitcase containing narcotics.  During the course of this investigation, agents conducting physical surveillance at CALDERON and SANCHEZ's on a near daily basis did not observe subjects taking or returning from an extended trip that would necessitate the use of a suitcase. In addition, there was no use of the suitcase that was used consistent with the urgency with which it was obtained from E. CALDERON's residence.

34.    Approximately one minute after SANCHEZ entered the apartment in Apartment Complex 1 with the suitcase, on January 21, 2025, at approximately 7:03 p.m., CALDERON placed an outgoing call to BARBER on the same phone number used at 5:39 p.m. The following is a summary of this intercepted call and not a verbatim translation:

| | |
|---|---|
| CALDERON: | says he got "it." |
| BARBER: | says alright dali that he is on his way back is packing the rest of his truck because he is moving. |
| CALDERON: | asks if BARBER needs an "eighth." |
| BARBER: | says that he will probably need more now since he's moving shit. |
| CALDERON: | says I got, I'm about to grub right now just let me know. |

35.    Based on my training, experience, and knowledge of the case, I believe that CALDERON – after SANCHEZ retrieved CALDERON's stash of narcotics – was prepared to distribute the "eighth" that BARBER had been requested since CALDERON had retrieved the "brick" (or bricks) referenced during their call at 5:39 p.m.

36.    On January 21, 2025, at approximately 11:48 p.m. BARBER was observed arriving at CALDERON's apartment in the same red Mercedes Benz used in the January 15, 2025 transaction with UC-1. BARBER exited the vehicle and entered CALDERON's apartment. At 11:50 p.m. BARBER exited CALDERON's apartment and got back into the red Mercedez Benz. The vehicle was surveilled exiting Apartment Complex 1 and traveling to BARBER's residence.

37.    Based upon my training, experience, and knowledge of the case, I believe these series of intercepted calls between CALDERON, E. CALDERON,

14

SANCHEZ and BARBER on January 21, 2025, were to facilitate the retrieval of at least one kilogram brick of cocaine from E. CALDERON's residence to CALDERON and SANCHEZ's apartment in Apartment Complex 1. Furthermore, I believe that CALDERON was attempting to retrieve the cocaine from CALDERON's apartment with urgency so that he could facilitate the distribution to BARBER. I believe BARBER obtained the suspected cocaine and drove them to his residence in preparation to distribute them later.

### *January 27, 2025 Interception re CALDERON's Stash Location.*

38.    On January 27, 2025 at approximately 4:59 p.m. CALDERON placed an outgoing call from TARGET TELEPHONE-2 to Conspirator 1. During the conversation CALDERON told Conspirator 1 he would not be around between the tenth and the fifteenth (suspected to be February 10-15, 2025). Later in the conversation Conspirator 1 asked CALDERON not to tell anyone when he leaves the house, to avoid a break in. CALDERON told Conspirator 1 that his "stashes are in his mother's house and no one knows where she lives at."

39.    At the end of the conversation, Conspirator 1 said to bring CALDERON those four today. CALDERON says he wants to get rid of that, he doesn't like to have too much work at home.

40.    Based on my training experience and knowledge of the investigation, I believe CALDERON referenced in this conversation with Conspirator 1 that he stores his narcotics with his mother, E. CALDERON, at her home. This statement is consistent with observations and evidence collected on or about January 21, 2025.

Additionally, when CALDERON mentions having "too much work at home" he was referring to keeping narcotics in his home. The term "work" is a commonly used code word used to describe illegal contraband such as drugs.

*January 29-30, 2025 Coordination of Purchase of Nine Ounces of Cocaine*

41.    On January 29, 2025 at approximately 4:00 p.m. UC-1 made contact with BARBER to arrange a purchase of cocaine. During the conversation UC-1 inquired what BARBER would be able to distribute. BARBER told UC-1 that he could obtain whatever was needed. UC-1  agreed to buy and BARBER agreed to sell nine ounces of cocaine. BARBER and UC-1 planned to complete the transaction at a predetermined location on January 30, 2025 during BARBER's lunch break from his job.  Nine ounces is approximately 252 grams, or around quarter of a kilogram.

42.    On January 29, 2025, minutes after the conversation with UC-1, at 4:39 p.m. CALDERON received three consecutive calls from telephone number (xxx) xxx-1272, a phone number subscribed to an associate of BARBER. These three calls were all unanswered by CALDERON.

43.    On January 29, 2025, at 5:14 p.m. CALDERON received an incoming call (xxx) xxx-0356 the same phone number provided to UC-1 by BARBER. During the call BARBER told CALDERON he is about to pull up on him in a halftime. At 5:36 p.m. BARBER called CALDERON again and said "im blazin up to you right now but make it a zip." At 5:42 p.m. BARBER calls CALDERON and says "I'm blazin up right now." CALDERON replied "dale" which roughly translates to "go ahead" or "go for it."

44.     Early in the day on January 30, 2025, BARBER advised UC-1 that he was only able to provide six ounces of cocaine and not the nine ounces that UC-1 requested the day before. The two planned to meet at 1:00 p.m.

45.     Before the 1:00 p.m. deal, BARBER advised UC-1 that he could acquire the additional three ounces ("zips") and have them for UC-1 at 2:30 p.m.

46.     On Thursday January 30, 2025 at 1:01 p.m. CALDERON placed an outgoing call to (xxx) xxx-4465, a phone number known to be used by BERNARDO ANTONIO BREA (BREA). The following is a partial summary of the call and not a verbatim transcript:

| | |
|---|---|
| CALDERON: | asks if he has the other shit. |
| BREA: | yes. |
| CALDERON: | asks if he has six of them. |
| BREA: | asks if they are "zips." |
| CALDERON: | yes. |
| BREA: | he probably has a half. |
| CALDERON: | what's the number on the half? |
| BREA: | I will call him right now. |

47.     I believe during this call CALDERON is conspiring with BREA to acquire cocaine for the purposes of distributing it.  As noted above, "zips" commonly refers to ounces among those involved in drug distribution.  BREA suggested in this conversation that his source has a half kilogram of cocaine available and he will check on the price.

48.     On Thursday January 30, 2025 at 1:15 p.m. CALDERON received an incoming call from BREA. In this conversation, CALDERON asked what BREA's source said about the "perico" and BREA responded "I will call him right now."

Based on training and experience, and in consultation with Spanish speaking colleagues, I know that "perico" is a slang term for cocaine.

49. On Thursday January 30, 2025, at 1:25 p.m. CALDERON called BREA. The following is a partial summary of the call and not a verbatim transcript:

| | |
|---|---|
| CALDERON: | "He" want the "9." |
| BREA: | I will make the call and asks if CALDERON knows those people for sure. |
| CALDERON: | Yes, it's for sure. . . . They are playing together and he is risking as well. |

50. Based on my training and experience, I believe that CALDERON was reassuring BREA that the purchaser of nine ounces was a legitimate customer and was not a risk.

51. On Thursday January 30, 2025 at 1:30 p.m. CALDERON received an call from BREA. The following is a partial summary of the call and not a verbatim transcript:

| | |
|---|---|
| BREA: | States his n***** is ready and asks if CALDERON's guy is ready to move ahead. |
| CALDERON: | Is heard speaking to someone in the background, asking if he is ready. |
| BREA: | Asks if the guy has all the bread? |
| CALDERON: | States the guy has the money and is ready. |
| BREA: | Says it's going to be about an hour before his guy is there at 2:30 p.m. sharp. They need to work the numbers out. |
| CALDERON: | It's $725.00 a piece, 5,300 and CALDERON is heard confirming with another person in the background. |

52. During this call I believe CALDERON was obtaining cocaine from BREA to sell to BARBER. Surveillance of BARBER indicated that he was with

CALDERON in Apartment Complex 1 at the time of this call and I believe that the person CALDERON was speaking to in the background was BARBER.

53.    Based on the series of calls on January 30, 2025, I believe BARBER told CALDERON he needed nine ounces of cocaine and CALDERON then contacted BREA to inquire about the additional three ounces of cocaine to complete the sale to BARBER who could sell them to UC-1.

54.    On January 30, 2025 at 1:40 p.m. CALDERON calledBREA. The following is a partial summary of the call and not a verbatim transcript:

| | |
|---|---|
| CALDERON: | It's for sure and asks how long it is going to be. |
| BREA: | By 2:30 p.m. |
| CALDERON: | You are going to make a rack on this. 725x9 is 6,500 minus the cost. CALDERON is heard speaking to someone in the background. |
| BREA: | It's 1,200. |
| CALDERON: | It's 775, almost a rack |
| BREA: | he is trying to have the guy do it for 5,100, BREA will call back. |

55.    Based on my training, experience, and knowledge of the case, I believe that BREA and CALDERON were discussing the distribution of cocaine to UC-1 and the costs and profits for the nine ounces of cocaine being distributed.

56.    On Thursday January 30, 2025 at 2:18 p.m. CALDERON received an incoming call from BREA. The following is a partial summary of the call and not a verbatim transcript:

| | |
|---|---|
| BREA: | The guy is enroute and asks where they are going to meet? |
| CALDERON: | States he is at the barbershop waiting for BREA to tell him he has "it." |
| BREA: | Where are they going to meet at? |
| CALDERON: | Little Walmart. Tells BREA he has to go with him. |

19

| | |
|---|---|
| BREA: | States he is not going, he is going to give him that and he's going to bring back his cash. |
| CALDERON: | Are you serious? |
| BREA: | I do not know them n*****s. |
| CALDERON: | Okay. |

57.     Based on my training, experience, and knowledge of the case, I believe

that CALDERON was attempting to get BREA to come with him to facilitate the

distribution of the cocaine  but BREA was not comfortable going to the transaction

because he does not know the buyer.

58.     On January 30, 2025 at 3:09 p.m. CALDERON called BREA.  The

following is a partial summary of the call and not a verbatim transcript:

| | |
|---|---|
| CALDERON: | Tells BREA what he is going to do, he is going to get in the car with BREA until the brother comes back with the money and does the transaction. CALDERON states he will sit in the car with BREA so BREA doesn't think they are going to do something to him. |
| BREA: | Starts to say he can't… |
| CALDERON: | States BREA will not be the one to me the custi [PH] because that is "this n*****s custi." |
| BREA: | Okay |
| CALDERON: | States he will just sit in the G-ride until "he" comes back and gives him the bread. "he" will be there in the parking lot and not going anywhere. CALDERON states he will be with BREA and will not do anything. |

59.     During this call CALDERON is explaining to BREA how the

distribution of narcotics is going to be completed, more specifically what steps

CALDERON is taking to make BREA more comfortable of his involvement with

the unknown "custi." I believe the word custi that is heard is an abbreviation of the

word customer and is referencing UC-1.

60.    At approximately 3:11-3:16 p.m., BARBER met with UC-1 and sold nine ounces of powder to him in exchange for $6,520. They met in the parking lot of a Walmart, as prearranged. Surveillance units were unable to ascertain if CALDERON was at or nearby this transaction between BARBER and UC-1.

61.    On Thursday January 30, 2025 at 3:58 p.m. CALDERON called BREA. The following is a partial summary of the call and not a verbatim transcript:

| | |
|---|---|
| BREA: | Asks CALDERON if he is good. |
| CALDERON: | Answers he is good. |
| BREA: | States he's just checking on him. |

62.    During this call I believe BREA was contacting CALDERON after the deal is completed to confirm that CALDERON was not robbed or arrested by law enforcement.

63.    The powder sold by nine ounces of suspected cocaine from BARBER was completed, the suspected narcotics were chemically analyzed and returned presumptive positive for the presence of cocaine. The total weight of the suspected cocaine with packaging was 258.4 grams, consistent with the nine ounces being arranged for sale.

### E. CALDERON narcotics distribution call with CALDERON

64.    On February 1, 2025 at 5:52 p.m. CALDERON received an incoming call from E. CALDERON (5797). The following is a summary of the call and not a verbatim transcript:

| | |
|---|---|
| E. CALDERON: | Where you at? |
| CALDERON: | selling drugs. |
| E. CALDERON: | oh, okay sound good. |

21

CALDERON:           okay.
E. CALDERON:        okay, God bless you.

65.     Based on my training, experience and knowledge of the investigation I

believe that this call indicates that E. CALDERON is familiar with and supportive of

CALDERON's illegal business.

66.     Based on the foregoing facts and evidence, I believe that probable cause

exists to charge LUIS RUBEN MARTINEZ CALDERO, AISHA NICOLLE

SANCHEZ, EVELYN CALDERON, QUAMAIN ALIQUE BARBER

BERNARDO ANTONIO BREA with one count of conspiracy to possess with

intent to distribute 500 grams or more of a mixture or substance containing a

detectable amount of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1)(B).

_____

John Fetscher
Special Agent
FBI

Affidavit submitted by email and attested to me
as true and accurate via telephone or video conference,
consistent with Fed. R. Crim. P. 4.1 and 4(d)(3), before me
this \_\_5ᵗʰ\_\_ day of February, 2025.

_____

Leslie Hoffman Price
United States Magistrate Judge

22